UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DANIEL KOCH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Cause No. 1:14-CV-72-HAB |
| ) | |
| JERRY W. BAILEY TRUCKING, INC., ) | |
| THE ESTATE OF JERRY W. BAILEY, ) | |
| and LINDA L. BAILEY, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

"But everyone else is doing it!" This, effectively, is the excuse that Defendants advance for not paying their employee truck drivers to perform DOT inspections, among other tasks. This rationale has not worked on a mother in recorded history and, as it turns out, is no more effective when explaining away wage and hour violations.

Before the Court are competing, dispositive motions addressing Defendant Jerry W. Bailey Trucking, Inc.'s ("JWBT") policy of not paying its drivers for work performed at the company yard before leaving for, and after returning from, the day's work tasks. Having reviewed the filings and the entirety of the record, the Court concludes that JWBT committed violations of the Fair Labor Standards Act ("FLSA") and Indiana's wage statutes. As such, the Court will enter partial summary judgment in favor of Plaintiffs.

**A.    Factual and Procedural Background**

**1.    *Factual Background***

Jerry W. Bailey ("Jerry") and Linda Bailey ("Linda") were co-owners of JWBT until Jerry's death. JWBT provides dump truck services, focusing on hauling demolition debris,

limestone and dirt. With respect to the relevant periods here, JWBT always owned approximately 40 tri-axle dump trucks. All trucks would be in use each day during peak seasons, with around 15 in use each day during the off-season. JWBT had gross revenues of $500,000.00 in 2010, 2011, and 2012.

While he was alive, Jerry was President of JWBT in addition to acting as a manager. Jerry, along with his son, Chad, oversaw hiring, firing, and raises for drivers. Linda was the Vice President of JWBT. She oversaw HR and operations for the company. She also served as the record keeper for timecards, inputting the driver's time worked into the accounting system. She spoke with at least two of the Plaintiffs when their paychecks or hours were incorrect.

The time inputted by Linda would be recorded by drivers on handwritten timecards. Hours were recorded to the quarter-hour, with employees rounding to the nearest 15 minutes. JWBT had a written policy requiring its drivers to report to work 15 minutes prior to the start of shift. However, JWBT did not begin to pay the drivers until they had driven their truck out of the work yard. Similarly, JWBT considered a driver's workday to be over when he returned to JWBT's facility.[1]

The apparent purpose for requiring drivers to report early was to allow the drivers to conduct pre-trip inspections of, and to warm up, the trucks. These inspections were required by JWBT policy and DOT regulations. Plaintiff Johnny Ray Wells, Jr. ("Wells") described a typical inspection:

> I would go to the truck, I would open the hood and check the oil. After that, the oil's good and I didn't have to go to the shop to get some, I would shut the hood. I go to the truck and start it. I would turn on the lights and four-ways and proceed to walk around the truck, checking my tires, making sure I'm not missing any lug nuts or mud flaps, making sure everything's good to go. Walk completely around the

---

[1] This policy changed in 2013, when JWBT began paying drivers fifteen minutes prior to dispatch time and fifteen minutes after returning to the yard.

2

> truck, just to make sure all my lights were working correctly. And then I'd proceed to walk to the shop after that[.]

(ECF No. 222 at 7). While there was some discrepancy as to the exact amount of time this inspection would take, Plaintiffs universally estimated that they would spend approximately fifteen minutes inspecting their truck in the morning.

Defendants have a different take on the drivers' morning routine. While they admit that the fifteen-minutes-early policy exists, they maintain that no one follows it. They also admit that drivers are supposed to conduct the inspection described by Wells, but they assert that the process only takes a few minutes. In a statement that would cause their liability insurer to have heart palpitations, Defendants state that sometimes drivers skip the inspection altogether. They also maintain that drivers often fail to warm up the diesel engines on the several-hundred-thousand-dollar dump trucks. Notably, Defendants do not testify that any of the Plaintiffs failed to conduct the required morning activities. Instead, their testimony indicts only unidentified "drivers."

Drivers had similar duties at the end of the day. After returning to JWBT, drivers would refuel their truck, record their mileage, conduct a post-trip inspection, and take their job paperwork into the office. Like the morning routine, Plaintiffs estimated that the process took approximately fifteen minutes, depending on whether the driver had to wait to refuel. Also like the morning routine, the drivers were not paid for this time.

Defendants do not dispute that the drivers had these morning and evening duties, nor that they were not on the clock while performing them. Instead, they provide reasons that this non-payment policy existed. Jerry testified that he talked to other dump truck business operators and believed that JWBT's policy was consistent with the rest of the industry. According to Plaintiffs, they were told that JWBT started the policy because "they had too many people out at the trucks

3

talking, and that they were paying their drivers for that extra time; and they weren't going to do that anymore." (*Id*. at 5).

**2.    *Procedural History***

On March 7, 2014, Plaintiff Koch filed a class and collective action against Defendants for violations of the FLSA. (ECF No. 1). An Amended Complaint, adding Plaintiff Wells, was filed one week later. (ECF No. 8). Koch and Wells moved to certify a collective action on March 22, 2014, consisting of employees of JWBT who "were not paid overtime wages for time spent performing morning (pre-driving) inspections, fueling and end of day (post-driving) inspections." (ECF No. 18). Two months later, the parties filed a stipulation for collective certification of the overtime wage claim and a class certification of the regular wage claim. After more than a year of additional briefing, this Court certified the following class action:

> All present truck drivers employed by Jerry W. Bailey Trucking Inc. and former truck drivers who voluntarily ended their employment, who were employed by Jerry W. Bailey Trucking Inc. on or after March 7, 2012, until November 1, 2013, and were not paid regular wages for time spent performing morning (pre-driving) inspections, fueling and end of day (post-driving) inspections.

(ECF No. 59 at 4). The Court also certified the following collective action:

> All present and former truck drivers employed by Jerry W. Bailey Trucking Inc. who were employed on or after June 1, 2011, until November 1, 2013, and were not paid overtime wages for time spent performing morning (pre-driving) inspections, fueling, and end of day (post-driving) inspections.

(*Id*. at 5).

In April 2018, Defendants moved to decertify the class and collective actions. Finding that Plaintiffs could not satisfy the numerosity requirement of Federal Rule 23(a)(1), this Court

decertified both the class and collective actions in May 2019.[2] As a result, Plaintiffs filed a Second Amended Complaint asserting individual claims on behalf of each Plaintiff. (ECF No. 191-1).

Defendants moved for summary judgment in April of this year. (ECF No. 204). On May 8, 2020, Plaintiffs moved to strike an argument in Defendant's summary judgment brief asserting that the Motor Carrier Exemption ("MCE") to the FLSA barred Plaintiffs' claims. (ECF No. 207). Plaintiffs claimed that the MCE was an affirmative defense that should have been asserted in Defendants answers to any one of Plaintiffs' complaints, and that Defendants' failure to do so prejudiced them. This Court granted Plaintiffs' motion to strike, striking Section II.B. of Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment. (ECF. No. 213). Plaintiffs' cross-moved for summary judgment (ECF No. 217), and both motions are now fully briefed.

**B.     Legal Analysis**

**1.     *Summary Judgment Standard***

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide,

---

[2] The Court notes that, in the interim, this case was transferred from Judge Van Bokkelen to Judge Springmann and then to this Court. This Court entered its order decertifying the class and collective actions in May 2019.

5

based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## 2. *Personal Liability*

The first issue before the Court is which, if any, of the Defendants can be held liable as an "employer" under the FLSA. The FLSA defines "employer" as "any person[3] acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). The parties seem to agree that JWBT is an employer; Defendants do not respond to Plaintiffs' argument that JWBT can be held liable under an enterprise theory. *See* 29

---

[3] "Person" is defined as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a).

U.S.C. § 203(a)(1)(A)(i). However, the parties actively dispute whether Jerry and Linda meet the definition of an employer.

A cause of action for violation of the FLSA lies only against an employer. 29 U.S.C. § 216(b). It is well settled that there may be more than one employer responsible for violations of the Act. *Falk v. Brennan*, 414 U.S 190, 195 (1973).

Because liability hinges on the label of "employer," that definition is designed to include persons who are responsible for causing violations of the FLSA. Because just about any supervisor, officer, or director may "act in the interest of the employer," the courts look to the parties exercising significant control over the employment relationship. If directors or officers or other employees have such control over the corporate entity that their decisions determine whether a violation occurs, then the FLSA considers them employers liable for the harm they cause. *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir.1987).

The FLSA statutory definition of an "employer" is a sui generous concept, not bounded by tests provided by the common law. *Dole v. Elliott Travel & Tours*, 942 F.2d 962, 965 (6th Cir. 1991); *McLaughlin v. Seafood, Inc*., 867 F.2d 875, 877 (5th Cir. 1989). The "economic reality" of the employment relationship controls, rather than formalistic labels or common law concepts of agency. *Goldberg v. Whitaker House Coop*., 366 U.S. 28, 33 (1961). The FLSA is remedial in nature and is intended to identify responsible parties without obfuscation by legal fictions applicable in other contexts. An analysis must focus upon the totality of the circumstances, underscoring the economic realities of the employment relationship. *Donovan v. Sabine Irrigation Co., Inc*., 695 F.2d 190, 194 (5th Cir. 1983).

The FLSA must be construed liberally to apply to the furthest reaches consistent with congressional direction. *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207 (1959). The FLSA is humanitarian and remedial in nature and must be constructed to effect Congress' purpose, which was to protect the country's workers. *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984). Against this backdrop, tests developed by the courts focus on the reality of which persons or entities controlled the economic relationship with the employees. The issue is not whether an individual controlled every aspect of the employees' conduct, *Elliott Travel*, 942 F.2d at 966; the issue in FLSA cases is whether the individual had control over the alleged violation of the Act. *Grim Hotel*, 747 F.2d at 972 ("It was only [the defendant owner] who could authorize compliance with the Fair Labor Standards Act."). Thus, this is really a question of duty: Based upon their control over decisions causing the violations of the FLSA, which persons had a duty as a statutory employer not to violate the Act?

A host of decisions from federal courts of all levels make clear that individuals may have such control over a corporation's affairs that they may be personally liable for FLSA violations. The Supreme Court noted years ago that the "expansiveness" of the Act's definition allows individuals to be employers of persons with whom the individuals have no direct contractual relationship. *Brennan*, 414 U.S. at 195 (substantial control of the terms and conditions of employees' work creates statutory employer status).

Addressing the "economic realities" of individual cases, courts have found liable individuals occupying a range of corporate positions and exercising various degrees of control. In each instance, a person must take an active role in the operation of an enterprise to incur personal liability. *Brennan*, 414 U.S. at 195; *Patel v. Wargo*, 803 F.2d 632, 638 (5th Cir. 1986). Personal liability may arise from a significant ownership interest in the corporation coupled with operational

8

control of significant aspects of the corporation's day-to-day functions. *Elliott Travel*, 942 F.2d at 966. A manager may be personally liable for FLSA violations if he or she acted on behalf of the corporation to cause the violations. *Brock v. VAFLA Corp.*, 668 F.Supp. 1516 (M.D. Fla. 1987). A corporate officer may be personally liable even if he or she has no ownership interest, if the officer "effectively dominates its administration." *Sabine Irrigation*, 695 F.2d at 194. Activities of officers or directors of closely held corporations are viewed carefully to determine whether those parties have exercised sufficient control to be personally liable. *Grim Hotel*, 747 F.2d at 972; *Sabine Irrigation*, 695 F.2d at 194.

Courts have considered financial control over a corporation a significant factor in determining whether an individual meets the statutory definition of an employer. *Grim Hotel*, 747 F.2d at 972 (imposed liability on majority shareholder who "held [corporations'] purse strings and guided their policies."); *Elliott Travel*, 942 F.2d at 966 (majority owner "controlled the purse strings"). This kind of financial control becomes almost conclusive when it involves the decision to keep a failing business in operation. An individual may become personally liable if he or she decides to keep employees working despite the corporation's inability to meet its statutory duty to pay the employees. *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983).

For all the evidence designated in this case, the Court has very little information regarding the day-to-day roles of either Jerry or Linda. Taking Linda first, she was co-owner and VP of Operations at JWBT. What those titles translated to in job duties sounds far less official. Linda kept the timecards and personnel files for JWBT's employees, and inputted employees' reported hours into JWBT's accounting software. She also discussed discrepancies in paychecks with two of the Plaintiffs.

The Court finds that these facts fall short of establishing that Linda was a statutory employer. There is no evidence that Linda took an active role in the operation of JWBT, that she controlled significant aspects of JWBT's day-to-day functions, or that she caused any of the violations. Plaintiffs describe Linda as "Human Resources for JWBT," (ECF No. 222 at 31), but there is no indication that she had any HR duties. Hiring, firing, and pay decisions, normally within the purview of HR, were handled by Chad and Jerry. Indeed, Linda's actual job duties sound far more like a file clerk/data entry person than that of a corporate executive. The Court cannot conclude, based on the designated evidence, that the "economic realities" support a finding of personal liability against Linda.

As Defendants concede, Jerry is a "closer call." (ECF No. 223 at 5). Jerry was the co-owner, President, and manager of JWBT. As noted above, Jerry and Chad shared hiring, firing, and pay raise duties. These facts, Plaintiffs assert, are enough to find that Jerry was an employer under the terms of the FLSA.

The evidence designated by Plaintiffs tells the Court almost nothing about Jerry's day-to-day activities. It does not appear that Jerry had any direct supervision of the drivers; the designated evidence shows that Chad occupied this role. (ECF No. 223 at 3–4). However, Defendants concede that Jerry "was in charge of the pay policies at Bailey Trucking." (ECF No. 206 at 15). This, along with his hiring and firing responsibilities, lead the Court to conclude that a reasonable juror could conclude that Jerry was personally liable for any FLSA violation. At the same time, a reasonable juror could also find the contrary. This matter is ultimately an issue for a jury to decide. *Foday v. Air Check, Inc.*, 2018 WL 3970142 at *3–5 (N.D. Ill Aug. 20, 2018) (finding that the relevant factors include whether the individual: "'(1) had the power to hire and fire the employees; (2)

10

supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.").

In summary, the Court finds that JWBT can be held liable under Plaintiffs' allegations. The Court further finds that genuine issues of material fact exist regarding the liability of The Estate of Jerry W. Bailey. Finally, the Court concludes that summary judgment should be entered in favor of Linda L. Bailey.

**3.**     ***Plaintiffs' Pre-Trip and Post-Trip Activities were Compensable***

**(i)**     *Time Spent Conducting Pre-Trip and Post-Trip Activities Constituted Working Time*

The parties do not appear to seriously dispute whether the morning and evening activities at issue were part of Plaintiffs' job activities. Indeed, the case law seems clear that, all things being equal, these activities are compensable work activities. *Hiner v. Penn-Harris-Madison School Corp.*, 256 F.Supp.2d 854, 860 (N.D. Ind. 2003); *Guzman v. Laredo Sys., Inc.*, 2012 WL 5197792 (N.D. Ill. Oct. 19, 2012); *O'Brien v. Encotech Const.*, 2004 WL 609798 (N.D. Ill. Mar. 23, 2004); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, 2004 WL 1882449 (N.D. Ill. Aug. 18, 2004). Therefore, the Court need only decide whether JWBT is relieved from paying Plaintiffs for this time under some other legal theory.

**(ii)**     *Time Spent Conducting Pre-Trip and Post-Trip Activities was not* De Minimus

JWBT's first argument is that any time spent by Plaintiffs conducting the activities at issue was *de minimus*. The *de minimis* doctrine allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute. *Singh v. City of New York*, 524 F.3d 361, 370 (2d Cir. 2008). JWBT bears the burden to show that the *de minimis* doctrine applies. *See Frank v. Wilson & Co., Inc.*, 172 F.2d 712, 715 (7th Cir. 1949) (characterizing the *de minimis* doctrine as a defense); *Spoerle v. Kraft Foods Global,*

11

*Inc.*, 527 F.Supp.2d 860, 868 (W.D. Wis. 2007) (explaining that because defendant sought to rely on the *de minimis* exception, the defendant had the burden of proof).

When evaluating whether work performed by an employee is *de minimis*, courts typically consider the amount of time spent on the extra work, the practical administrative difficulties of recording additional time, the regularity with which the additional work is performed, and the aggregate amount of compensable time. *Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir. 1984); *see also* 29 C.F.R. § 785.47 ("In recording working time . . . insubstantial . . . periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded . . . . This rule applies only where there are uncertain . . . periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities."). However, "[a]n employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." 29 C.F.R. § 785.47.

Weighing the *Lindow* factors, the Court finds that the time here was not *de minimus*. The time spent on the extra work, according to Plaintiffs, is approximately thirty minutes per day: fifteen in the morning, and fifteen in the evening. This amount of time weighs against finding the time *de minimus*. *See*, *e.g.*, *U.S. Dept. of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 780 (6th Cir. 1995) (half-hour per day not *de minimus*).

The Court notes that Defendants attempt to cast doubt on Plaintiffs' estimates. Specifically, they assert that some employees do not perform the pre- and post-trip activities and that, even if they did, Chad and Jerry think the activities should only take two to four minutes. (ECF No. 205 at 6–7). But, as Plaintiffs note, this testimony does not directly contradict Plaintiffs' testimony

12

because none of the testimony relates to Plaintiffs. While *some* employees of JWBT may not have performed the required activities, there is no evidence that Plaintiffs failed to do so. Moreover, simply because Jerry or Chad could perform the activities quicker than Plaintiffs does not mean that Plaintiffs did not take the time they represent. The Court finds, then, that Chad and Jerry's testimony does not create a genuine issue of material fact.[4]

With respect to "practical administrative difficulties," JWBT argues that its intent was to have the drivers' time sheets match the dispatch sheets for purposes of billing JWBT's customers. JWBT argues that it "would potentially create difficulty" if the drivers' time sheets were different from the dispatch sheets. (ECF No. 206 at 11). JWBT further argues that the time at issue would be difficult to track since not all employees followed company policy with respect to pre- and post-trip work.

The Court does not find either argument compelling. JWBT provides no reason why drivers could not record pre- and post-trip activities separately from their billable driving time, and the Court can think of none. The "difficulty" imagined by JWBT exists, then, only by virtue of the way that drivers currently record time. Having drivers record these activities separately would also solve JWBT's second concern, since only drivers that performed the work would record it and only those drivers would need to be paid for their performance. It is clear to the Court that whatever hurdles JWBT may have had to cross would not have been insurmountable and that simple solutions could have been implemented to record the subject time. This factor weighs in favor of the time not being *de minimus*. *See Kellar v. Summit Seating, Inc*., 664 F.3d 169, 176–77 (7th Cir. 2011).

---

[4] The Court notes that, given the other *Lindow* factors, the Court would find that the time was not *de minimum* even if it found that Plaintiffs' additional activities took only two to four minutes per day. Accordingly, even if Chad and Jerry's testimony could create an issue of fact, it would not be a material one.

The final two factors are not discussed by JWBT and easily weigh in favor of Plaintiffs. The work at issue was conducted every day, making it easy to record and compute. *Id*. In addition, the aggregate amount of time is significant, with each Plaintiff claiming owed amounts in the thousands of dollars. These factors, like the others, weigh in favor of a finding that the time was not *de minimus*. Accordingly, JWBT cannot escape liability under this theory.

**(iii)** *Rounding Does Not Help JWBT*

JWBT next asserts that its practice of rounding to the nearest quarter hour solves any issues raised by Plaintiffs. Essentially, JWBT argues that since drivers were able to round their time up to the nearest quarter hour, any additional time they spent doing the pre- and post-trip activities came out in the wash.

JWBT is correct that rounding is an accepted and acceptable practice. The applicable regulations permit rounding to the nearest quarter hour. 29 C.F.R. § 785.48(b). "Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." *Id*.

The Court finds, however, that JWBT attempts to make the rounding regulation do more than its intended purpose. The simple fact is that the rounding regulation was never intended to round off work time. Instead, the regulation is intended to avoid "minor differences between the clock records and actual hours worked" as a result of early or late time clock punching. 29 C.F.R. § 785.48(a). Stated another way, the rounding regulation is intended to smooth out the differences that result from clocking in minutes early or minutes late. It is not intended to shave work time off where an employer requires work to be performed before and after the "official" workday.

14

More to the point, the way that JWBT utilized the rounding regulation is contrary to its express language. Under the terms of the regulation, it cannot be used where it results in "failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(a). Employers that utilize rounding must still ensure that employees are paid for all time spent in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Abukar v. Reynolds Mach. Co. LLC*, 2019 WL 6896154 at *2 (E.D. Wis. Dec. 18, 2019) (quoting 29 C.F.R. § 785.7). Thus, rounding policies that often cause employees to work unpaid violate the FLSA. *Russell v. Ill. Bell Tel. Co., Inc.*, 721 F.Supp.2d 804, 820 (N.D. Ill. 2010).

The designated evidence demonstrates that JWBT's rounding policy, coupled with undisputed amounts of time spent by Plaintiffs in pre- and post-trip activities, will almost always benefit JWBT. As Plaintiffs' have demonstrated in their briefing, where JWBT's drivers spent ten minutes on pre- or post-trip activities, the JWBT's rounding policy benefits the company two-thirds of the time, with the remaining one-third being neutral. (ECF No. 222 at 33). If the time spent is fifteen minutes, the rounding policy will always result in the drivers being short-changed by a quarter hour. This is not a permissible use of the rounding regulation that, "on average, favors neither overpayment nor underpayment." *Alonzo v. Maximus, Inc.*, 832 F.Supp.2d 1122, 1126 (C.D. Cal. 2011). Instead, either by design or implementation, JWBT's rounding policy violates the FLSA by ensuring that, on average, its drivers will always be underpaid.

In summary, the Court concludes that, as a matter of law, JWBT violated the FLSA by requiring its drivers to perform unpaid activities both before and after their paid workday. The activities were compensable work activities and JWBT had no legal basis to withhold pay. The Court will, therefore, enter summary judgment in favor of the Plaintiffs finding JWBT liable under

15

both the FLSA and Indiana's Wage Payment and Wage Claim statutes. *See Kellar*, 664 F.3d at 178 (finding that plaintiff's "state law claim under Indiana's Wage Payment Statute is derivative of her FLSA claim.").

**4.**     *Genuine Issues of Material Fact Exist as to Willfulness*

The FLSA generally provides for a two-year statute of limitations on actions to enforce its provisions but allows a three-year limitations period for "a cause of action arising out of a willful violation." Here, if JWBT is found to have willfully violated the FLSA, it will be liable for the pay violations for the three years preceding the filing of the Complaint. The standard for willfulness under the FLSA is "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). The plaintiff bears the burden of establishing willfulness. *Caraballo v. City of Chi.*, 969 F.Supp.2d 1008, 1024 (N.D. Ill. 2013). Whether an employer acted willfully is generally a question for the finder of fact. *Reynoso v. Motel LLC*, 71 F.Supp.3d 792, 799 (N.D. Ill. 2014) (citing *Bankston v. State of Ill.*, 60 F.3d 1249, 1253 (7th Cir. 1995)).

Plaintiffs provide the Court with very little upon which to base a finding of willfulness. Plaintiffs submitted only one paragraph of argument regarding willfulness in their memorandum in support of their cross-motion for summary judgment. They argue, in summary, that JWBT knew that Plaintiffs performed work and failed to pay them. While this is sufficient evidence to constitute a violation of the FLSA, it raises only a question of fact for trial with regard to willfulness. *Cardenas v. Grozdic*, 67 F.Supp.3d 917, 926 (N.D. Ill. 2014).

This is not to say that the Court is overwhelmed by JWBT's evidence in response. JWBT points to its belief that its policies were consistent with other businesses in the trucking industry, the fact that it hired outside accountants to assist with payroll, and an unrelated audit by the Indiana

16

Department of Labor as evidence that, at worst, it was "negligent in its application of its time keeping procedures." (ECF No. 206 at 17). The Court does not find any of these excuses particularly compelling. However, when taken together, and coupled with the fact that none of the Plaintiffs ever complained about JWBT's policies during their employment, the Court finds that the question of willfulness must be submitted to the jury.

**5.**     *Genuine Issues of Fact Exist as to Good Faith*

The Indiana Wage Payment Act provides, in addition to back pay, liquidated damages in certain circumstances. Specifically,

> if the court in any such suit determines that the person, firm, corporation, limited liability company, or association that failed to pay the employee as provided in section 1 of this chapter was not acting in good faith, the court shall order, as liquidated damages for the failure to pay wages, that the employee be paid an amount equal to two (2) times the amount of wages due the employee.

Ind. Code § 22-2-5-2.[5] Given the relatively young age of this provision, the Court can find scant case law addressing the good faith finding in the context of this statute.

Generally, "good faith" is defined by Indiana law as "a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and belief that one's conduct is not unconscionable." *Owens v. Schoenberger*, 681 N.E.2d 760, 764 (Ind. Ct. App. 1997). Thus, the question for the Court is whether JWBT believed that its payment policies were lawful.

For the same reasons as set forth above, the Court concludes that the issue of good faith is one for the jury. Both sides have submitted evidence that would permit a jury to find in their favor on this issue. A jury could conclude that JWBT's extended period of non-payment was indicative

---

[5] As Defendants note, this language was added via amendment in 2015, after the alleged actions in this case occurred. However, the Indiana Court of Appeals has held that the liquidated damages provision should be applied retrospectively. *Brown v. Bucher and Christian Consulting, Inc.*, 87 N.E.2d 22, 27 (Ind. Ct. App. 2017).

17

of bad faith, but it could also find that JWBT honestly believed that its rounding practices were legal. The matter cannot be decided by summary judgment.

**6.     *Plaintiffs' Request for Tolling is Granted***

Normally in a FLSA collective action, the statute of limitations for each plaintiff runs when he or she files written consent with the court electing to join the lawsuit, not when the named plaintiff files the complaint. *See* 29 U.S.C. § 256(b). However, courts have discretion to equitably toll the limitations period in appropriate cases in order "to avoid inequitable circumstances." *Yahraes v. Restaurant Assocs. Events Corp.*, 2011 WL 844963, at *1 (E.D.N.Y. Mar. 8, 2011).

Here, Plaintiffs claim that the more than fourteen months between the motion for class certification and the eventual certification, along with a two month period where Defendants allegedly "refused to provide the Class list," should be excluded from the calculation of the statute of limitations. (ECF No. 222 at 40). Defendants disagree, noting that they were not at fault for most of the delay, and that the later opt-ins could have filed their own lawsuit at any time. (ECF No. 223 at 9).

The Court agrees with Plaintiffs that it ultimately bears responsibility for more than a year of delay, and that the delay should not be visited upon Plaintiffs. As the Southern District of New York noted, "[w]hile plaintiffs wishing to pursue their rights cannot sit on them indefinitely, those whose putative class representatives and their counsel are diligently and timely pursuing the claims should also not be penalized due to the courts' heavy dockets and understandable delays in rulings." *McGlone v. Contract Callers, Inc.*, 867 F.Supp.2d 438, 445 (S.D.N.Y. 2012).

The Court, however, does not agree that the full amount of time requested by Plaintiffs is appropriate. Specifically, the Court does not find it appropriate to toll the period between the Plaintiffs' motion for class certification (April 22, 2014) and the parties' stipulation for class

18

certification (May 29, 2014). This period appears to have been spent by the parties negotiating the conditional class certification and, in any event, would have been a reasonable amount of time for the Court to have ruled on Plaintiffs' motion. In addition, the Court finds that an additional ten days can be excluded from tolling, as this was the agreed period for Defendants' to turn over the class list. The Court, therefore, concludes that the appropriate tolling period is from June 8, 2014, to September 14, 2015.

**C.     Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 204) is GRANTED in part and DENIED in part. The Court grants summary judgment in favor of Defendant Linda L. Bailey and against Plaintiffs on all claims. Defendants Jerry W. Bailey Trucking, Inc. and The Estate of Jerry W. Bailey's request for summary judgment is denied.

Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 217) is GRANTED in part and DENIED in part. The Court grants summary judgment in favor of Plaintiffs and against Defendant Jerry W. Bailey Trucking, Inc. on the issue of liability only with respect to their claims under the FLSA and Indiana's wage payment statutes. The Court further finds that a period from June 8, 2014, through September 14, 2015, shall be excluded from the calculation of any statute of limitations in this case. Plaintiffs' Cross-Motion for Summary Judgment is denied in all other respects.

SO ORDERED on August 27, 2020.

    s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT